## WOLF ·v. NATIONAL PARLOR SUIT CO.

(District Court, E. D. New York. July 25, 1917.)

1. Patents ☞66—Anticipation—Prior Patent Issued on Later Application.

A patent is not available as an anticipation of another patent upon the device of which it is expressly claimed to be an improvement, and which, although of later issue, was first applied for.

2. Words and Phrases—"Engage."

"Engage," as used in a patent claim, does not necessarily mean "gear or mesh with." Two plates can only engage by putting them in some bearing contact with each other, but an engagement may exist between two surfaces without the plurality of engagements going to make up a gear or mesh.

3. Patents ☞328—Validity and Infringement—Corner Lock for Bedsteads.

The Wolf patent, No. 1,120,638, for a corner lock for bedsteads, *held* valid, and claims 2 and 3 infringed. Claims 1, 11, and 12 *held* not infringed.

4. Patents ☞328—Validity and Infringement—Corner Lock for Bedsteads.

The Wolf & Governale patent, No. 1,143,796, for a corner lock for bedsteads, *held* valid, but not infringed.

In Equity. Suit by Aaron Wolf against the National Parlor Suit Company. On final hearing. Decree for complainant in part and for defendant in part.

Irving M. Obrieght and Clair W. Fairbank, both of New York City, for plaintiff.

Munn & Munn, of New York City, and W. S. Duvall, of Chicago, Ill., for defendant.

CHATFIELD, District Judge. The plaintiff is connected with the Metallic Flexible Hose Company, which is in the business of making corner locks for metal and wooden beds, and uses the patent rights of the plaintiff therefor. He shows title either as patentee or assignee to the patents in suit, and sufficiently supports his claim as coinventor, in some of the patents which will be hereafter set forth, although the defendant has intimated in the record that the invention was that of the copatentee or some workman.

It is unnecessary to state in detail the general scope of the prior art and the development of corner locks for bedsteads, except as some particular feature of the prior art patents enters into the present case.

The general form of a wedging or dovetailed connection between iron parts attached to the sides and head of a wooden bedstead, the changes occurring when iron and brass bedsteads made the use of slats unnecessary, and the form of large iron castings which encircled the corner posts, with apertures in the solid casting for insertion of the wedging parts, are matters of common knowledge. These large castings were heavy, easily breakable, and uneven in size, unless expensively prepared to give uniformity.

A number of patents have been introduced beginning with Ball, No. 2,562, of April 16, 1842, and Bostwick, No. 166,961, of August 24, 1875, both of which present wedging or dovetailing iron pieces to hold together the side slat and the end of a wooden bedstead. The patents to Barcalo, No. 536,368, March 26, 1895; Mellon, No. 554,132, February 4, 1896; Newman & Bothwell, No. 576,224, February 2, 1897; Dyer, No. 591,960, October 19, 1897; Walton, No. 644,481, February 27, 1900; Williams, No. 691,427, January 21, 1902; Newell, No. 714,733, December 2, 1902; Strobel, No. 732,133, June 30, 1903; Benjamin, No. 733,127, July 7, 1903; Nelson, No. 789,869, May 16, 1905; Nelson, No. 794,039, July 4, 1905; Nelson, No. 800,006, September 19, 1905; Murphy, No. 822,682, June 5, 1906; Kutz, No. 853,927, May 14, 1907; Berry, No. 921,349, May 11, 1909; Merriweather, No. 953,480, March 29, 1910; Duke, No. 954,563, April 12, 1910; Fox, No. 1,055,392, March 11, 1913—all illustrate the progressive application of a cast-iron corner post to a metal bed and the use of various forms of wedging joints therewith.

In the patents to Mellon and Nelson (789,869) a bolt with a winged nut is substituted for the wedge, and the parts are brought into contact upon more than one surface so as to insure the tight fastening produced by the wedge.

In Dyer, Williams, Merriweather, and Duke the wedging action is obtained in connection with a tenon like a bolt head.

In Mellon, Newman, Benjamin, Berry, Merriweather, and Nelson (789,869) the fastening is accomplished by using for the wedging or tightening action the various faces of the angle iron forming the end of the side rail.

In some of these patents, as in Mellon, the end rail is inserted in an opening in the block, while the angle iron side rail is applied on the outside of the block for holding by a winged nut. In other patents, as in Berry, in an English patent, No. 2,371, of 1897, to Samuel Bott,

and in Benjamin, the angle iron of the side rail is inserted in an opening within the casting or block forming the corner lock.

In the patents to Walton, Duke, Nelson (789,869), and Okun, No. 1,001,882, use is made of two bolts or tenons through openings in the side rail to fasten it firmly, by lugs or screws, while in Williams, Fox, and Merriweather the use of one fastening upon each flange of the angle iron, in order to secure rigidity by means of two points of connection, is plainly shown. .

In a number of patents the presence of the necessary shoulder or part to which attachment is desired (wherever that may be required) is secured by adding to the casting or creating in the casting a metal surface which shall present the proper shape for the use intended.

In a metal bedstead an end bar is necessary to hold the corner locks rigid as a part of a frame in lieu of the solid board furnished by the head of the wooden bedstead.

The patents cited show the employment of similar methods of furnishing contact for attachment of these end bars to the corner locks to those used for the joints between the side bars and the corner blocks. But it is evident that in most instances the connection between the corner block and the end rail is made permanent, and need not be so easily separable as in the case of the side rails, which are intended to be removed when the bedstead is taken apart.

The problem is to make this joint so that the setting up and taking down of the bedstead shall be easy without the use of tools, and yet that the joint shall be as rigid and strong as that furnished by the fixed attachment of the end rail itself. No mechanical invention would be shown in applying to a side rail the form of surface which had given a rigid joint, when used with an end rail in an earlier patent, if the only change was in the substitution of a wedge or bolt for a rivet. Nor would the obvious requirements and methods of making a corner block from sheet metal instead of cast metal of themselves constitute patentable novelty. The stamping or bending out of lugs in the place of casting a part in the same position was old in the art before Wolf's time, and all ideas of tightening by a wedging contact which had been made plain in the cast iron corner blocks were open to those who sought to use a different material or to gain lightness and commercial advantage with strength of construction by the substitution of a hollow sheet metal fastening. Nor would the use of sheet metal in the place of cast metal of itself be patentable so long as we are concerned with the form and combination of parts of the device.

These patents are not process or method patents, and the claims of invention or originality depend upon the combination of mechanical ideas shown by the device produced as a combination, when considered from the standpoint of the mechanical accomplishment which each part of the device furnishes. Economy of weight, price, or breakage would not of themselves present any difference in the mechanical use of the part substituted for the purpose of effecting the saving. Inventive novelty might be introduced by the use of the necessary parts to meet the needs presented by the difference in material. But, if the need is the same as that shown by the former material, the application of the old shape or form to supply the same need in a different part

of the structure, when made out of the new material, could not be made the basis of a claim of invention.

When the idea of using sheet metal or stamping the material for corner locks came into use as is illustrated in the Shapiro patent, No. 947,858, February 1, 1910, granted upon an application filed October 9, 1909, the advantages were plainly apparent. The idea of shortening the side bar for purposes of shipping was shown in Newman & Bothwell, No. 576,224, in 1897, while the year before Mellon, in patent No. 554,132, disclosed the idea of turning the side rail or reversing it so as to make the channel iron available for holding slats. Several of the patents, such as Williams, 1902, Benjamin, 1903, Kutz, 1907, and Berry, 1909, have the same feature. The idea of adjusting the length of the side rail by making the attachment closer or further from the end of the rail is obvious, and is used by Okun, but not by the plaintiff.

But failure to secure strength and rigidity with simplicity of construction and operation and without great weight or size is shown by the record to have been the result, until the plaintiff, with one A. Governale, began to file a series of applications in the Patent Office showing the use of a sheet metal housing, stamped from a single piece, of such shape that the difficulties were overcome.

The idea of making the structure by stamping from sheet metal was old. Shapiro, supra; Okun, No. 1,001,882, of August 29, 1911. The general idea of stamping the blank so that it could be folded to bring various parts into the position desired was well known in the paper box and pattern art, as well as in metal adaptations of the same idea. The inventors, Wolf & Governale, attempted to plan a combination which would give the wedging and locking effects of the prior art by the use of parts which could be presented after folding up a blank so as to furnish the bearing and supporting surfaces where needed. Their solution of the problem, like that of the defendant, was aimed at a practical, satisfactory, and cheap plan or pattern for the blank, and a strong, simple combination of the three or four essentials in each structure. The insertion of lugs or plates, through openings in which a wedge or bolt could be driven to fasten the lock to the hollow metal post or flat rail, was old, and no novelty was presented by the use of these ideas.

The record shows that Wolf & Governale succeeded in making a lock which met the need in most ways. They described this in an application filed June 11, 1912, but which was not finally allowed by the Patent Office until June 22, 1915, under patent No. 1,143,796. Suit is brought upon this patent on claims 5, 6, and 7. Of these claims 6 and 7, which do not specify the housing as tubular, were submitted as amendments in the Patent Office as late as April 12, 1915.

It is hence charged that the plaintiff was able to draw its claims with reference to the defendant's construction at a date long after the filing of the plaintiff's application, and the argument is drawn that the plaintiff thereby sought to cover and to render infringing the defendant's device.

But in the meantime Wolf filed an application on August 2, 1912, resulting in patent No. 1,148,256, and another one upon the 14th of

June, 1913, which appears to have been allowed as an improvement over his patent No. 1,048,256. Upon the application of June 14, 1913, he was allowed patent No. 1,120,638, upon the 8th day of December, 1914, which is one of the patents in suit. Thus not only was the improvement patent issued first, but it recites that it relates to an invention of the general type shown in the other Wolf & Governale patent, which was issued December 24, 1912, No. 1,048,256, upon the application filed subsequent to that for patent No. 1,143,796, the first patent in suit.

It also appears from the record that Governale then, with another person of the same name, ceased his general work with Wolf, and upon the 15th day of January, 1913, filed an application for a patent which was finally issued on the 29th of April, 1913, under No. 1,060,-180, for a corner lock embodying many of the features shown in the Wolf & Governale lock, but with different methods of holding and fastening the parts.

It is unnecessary to consider whether this was valid as an improvement patent or valid as an independent patent, and the record shows that the structure is complicated so that commercially the art has developed in the direction of the Wolf patents as distinguished therefrom.

The present suit involves claims 1, 2, 3, 11, and 12 of the Wolf patent No. 1,120,638, which, as has just been stated, was subsequent in application, but prior in point of issue to the other patent in suit, No. 1,143,796.

[1] The defendant has based much of its argument in its brief upon supposed anticipation by the Wolf & Governale patent, No. 1,048,256, issued December 24, 1912; that is, prior to the issuance of both of the patents in suit. This patent, as has been stated, was based upon an application filed August 2, 1912, and is expressly claimed as an improvement upon the application resulting in patent No. 1,143,796, and is not available as an anticipation against that patent. The Barbed Wire Patent, 143 U. S. 275, 12 Sup. Ct. 443, 450, 36 L. Ed. 154; Suffolk Co. v. Hayden, 70 U. S. (3 Wall.) 315, 18 L. Ed. 76; Ide v. Trorlicht et al., 115 Fed. 137, 53 C. C. A. 341; Century Elec. Co. v. Westinghouse E. & Mfg. Co., 191 Fed. 354, 112 C. C. A. 8. The defendant is not a manufacturer, but it makes and sells bedsteads and procures the bedstead corners from a company known as the Seng Company, which, according to the plaintiff's testimony, is the only business competitor having a successful sheet metal bedstead corner lock which has been upon the market since Wolf brought out his form of device.

It appears from the record that the Seng Company and its counsel are actually conducting this suit for the defendant, and the alleged infringing device is made in accordance with a patent to one Morris B. Okun, issued under No. 1,126,068, upon the 26th of January, 1915, on an application filed February 28, 1914. This Okun patent, which, as has been pointed out, was granted prior to the Wolf patent, No. 1,143,796, makes use of the idea of turning end for end and hence reversing the channel iron side rail, of making the length of the bed adjustable by furnishing two notches at each end of the side rail, either

of which can be used for the insertion of the wedge part, and employs a bolt with a winged nut to clamp together the locking structure. This Okun patent is the property of the Seng Company, and there have been introduced in evidence three other patents to Okun. No. 1,001,-882, August 29, 1911, describes a fastening generally consisting of a notch or socket to receive a tenon or knob firmly affixed to the side rail. The second Okun patent was issued under No. 1,076,838, upon the 28th day of October, 1913, and shows another form of corner with a different shaped slot for the receipt of a tenon, similar to that in the previous patent. This patent makes use of a sheet metal housing. The third Okun patent, No. 1,083,938, issued upon the 13th of January, 1914, shows a metallic blank folded after stamping into such form and shape as to furnish parts for the attachment of the side rails and end rails, and these rails are in turn fastened by a bolt with the winged nut used in the fourth or latest Okun patent.

The third Okun patent, granted upon an application filed August 1, 1913, shows a horizontal and a vertical lug stamped out and bent back from a blank forming the lock, in such positions as to come in contact with the sides of the end rail, while forming a right angle with each other. This particular arrangement is also shown in the last Okun patent under which the alleged infringing device is manufactured, and the defendant seeks to distinguish this feature from the Wolf patent in suit, No. 1,120,638, by pointing out that in the Patent Office Wolf contended for originality and patentability in making these two lugs engage or come in contact with each other so as to form a rigid support. It is evident that, if riveted to a solid iron rail, the Okun structure would be rigid, as the lugs could not be bent down toward each other, even though not in contact at the outset, and both Okun and Wolf show the same improvement over Shapiro which was finally allowed by the Patent Office.

In the Shapiro patent, No. 947,858, of February 1, 1910, the two lugs are cut from opposite or parallel sides of the corner lock, and rigidity against bending is secured by inserting the end of the head rail into the structure of the corner lock itself. In another form of Shapiro a single lug is used, extending vertically instead of horizontally, but with two rivet holes in the lug, as in Walton. This would insure against twisting of the rail upon the lug, that is, upon the pivot which Wolf testifies was one of the commercial grounds for criticism in his first patent in suit, No. 1,143,796, and we thus find that the second Wolf patent was an improvement over earlier Wolf patents and over Shapiro in the same sense in which Okun seeks an improvement by a change similar in result, but with a slight difference in construction.

The only evidence as to priority of invention between Wolf and Okun is furnished by the date of application. On August 2, 1912, when the application for patent No. 1,048,256 was filed, Wolf was still using the single lug. On January 13, 1913, Okun had not found out the use of a double lug, and in fact was not using the boxlike corner lock, but, as shown in application for patent No. 1,076,838, was constructing his corner lock of different sections of angle iron. But on June 14, 1913, Wolf applied for the patent No. 1,120,638, and was immediately

followed on August 1, 1913, by Okun, who then used the box-shaped stamped housing or metal lock with the pair of lugs placed at a right angle to each other for the support of the end rail.

But Wolf did not get his patent at once. The Patent Office rejected this several times after January 13, 1914, when the Okun patent, No. 1,083,938, was actually issued, and Wolf, while distinguishing from Shapiro, by claiming benefit from having two lugs at right angles and engaging so as to furnish rigidity, was evidently aware of the advantage of so wording his claims as to cover the device in which the two lugs were at right angles, but not in contact.

If an interference had been declared between Wolf and Okun on this question, priority of invention might have been determined in the Patent Office, but the Okun patent having been issued, the Patent Office contented itself with allowing the Wolf claims in the broader form, and claims 1, 2, 3, and 12 of patent No. 1,120,638 are not limited to a structure in which the two lugs are in contact, while claim 11 expressly specifies that the two lugs engage with each other.

[2] It is unnecessary to consider the contention raised by the defendant that the word "engage" means "gear or mesh with." Two plates can only engage by putting them in some bearing contact with each other. An engagement may exist between two surfaces without the plurality of engagements going to make up a gear or mesh.

[3] It will be held, therefore, that Wolf shows earlier than Okun the idea of stamping out and folding over the rigid right-angle support for the end rail, and the device in suit must be held to infringe claims 2 and 3 of the Wolf patent, No. 1,120,638, if these claims are valid as broad basic claims for this form of housing. Both Wolf and Okun thus must be held to show the same invention. Okun cannot claim as new his method of arranging the lugs, which are the mechanical equivalent of the structure of prior date in the Wolf application.

[4] There remains the more serious question as to the general form of the housing or boxlike structure made from the blank metal stamp. As has been already said the Shapiro patent, which the record shows is owned by the Seng Company, manufacturer of the alleged infringing device, disclosed as early as February 1, 1910, the use of the housing or box stamped from a sheet of metal and folded like a pasteboard box into such form as to bring the desired parts into place. Shapiro also showed a box tubular in character, in the sense that it made use of the four side supporting walls formed by folding up the stamped blank, and left the ends open, as no use was to be made therefrom. But Shapiro attached his angle iron rail upon the outside of this box, while Wolf & Governale employed the tubular box for the purpose of receiving the rail inside the box. The particular idea of inserting the rail was not of itself patentable novelty. In addition, this was shown in the English patent to Samuel Bott, of which copies have been on file in the United States since 1897, this patent being British patent No. 2,371, of 1897, and also the Dyer patent, No. 591,960, of October 19, 1897, and other patents of the cast iron art.

But Wolf & Governale applied the sheet metal tubular box as an outside casing for the structure within which they were to lock the

parts holding the side rail of the bed, and also to bend out the parts to which the end rail would be attached. This idea is made use of in the Okun patents, Nos. 1,083,938 and 1,126,068; but Okun seeks to avoid infringement by describing an irregular-sided metal box which could not be called a tube, from its shape in the direction in which the side rail is inserted. In fact, the Okun device has more sides, when viewed from any standpoint, than could properly be located in a purely tubular structure. In this sense Okun undoubtedly avoids the charge of infringing those claims of the Wolf & Governale patents which specify the tubular box. These claims got through the Patent Office by emphasizing the economical and simple arrangement in which unnecessary parts were avoided. Okun could not form the parts which he requires from a blank which would give a housing tubular in shape. It is therefore evident that the Wolf patent, the Wolf & Governale patents, and the Okun patents have patentable improvements over the prior art, but Okun certainly does not infringe claims 1, 2, and 5 of patent No. 1,143,796, nor claim 1 of patent No. 1,120,638, which are limited to the tubular member. Claims 2, 3, 11, and 12 of patent No. 1,120,638 are not broad claims for the general form of device. This had been presented in the application for patent No. 1,143,796. If these claims of No. 1,120,638 are not to be limited to the exact improvement shown in the claims, they were anticipated by the disclosures of No. 1,048,256. Both of these patents were claimed as improvements on the earlier application, and must be so construed. Otherwise the claims of the generic patent would be invalid for double patenting. Apart from the generic idea, the structure of No. 1,120,638 is not shown by No. 1,048,256.

When, therefore, Wolf & Governale seek to show a broad claim for "a member formed from a sheet metal blank * * * having an opening in the end thereof * * * into which a side rail may slide endwise, * * * with a fastening member extending vertically through said first mentioned member," as set forth in claims 6 and 7 of patent No. 1,143,796, it would be necessary to conclude that they did not mean what they said when they limited claim 6 and claim 7 by making one part or side of the member (which was tubular in form, but which was not so described) present a "transversely extending edge for engagement with the under side of said side rail," as in claim 6, or as in claim 7, "a supporting member * * * for engagement with the lower side of the end portion of said side rail." This Okun and the defendant do not show.

Thus Wolf & Governale, while they finally used in claims 6 and 7 language broad enough to cover a five-sided box instead of a four-sided tubular member, nevertheless have plainly so limited themselves in their specifications and drawings and in the meaning of the words expressed in claims 6 and 7 as to make impossible the absolutely basic claim for any kind of a blank metal box into which the side rail could be slid endwise.

The Okun patents, Nos. 1,083,938 and 1,126,068, show the use of the blank metal box structure which was old in Shapiro, but with a use of that structure similar to the use made by Wolf & Governale. But the adaptation of this boxlike structure to this general use was not

patentable novelty. The patentable combination allowed to Wolf & Governale, while valid, should not be so extended as to include every form of stamped metal box or housing.

There should be a decree that the claims of the patent No. 1,143,796 and claims 1, 11, and 12 of patent No. 1,120,638 in suit are valid, but not infringed. Claims 2 and 3 of patent No. 1,120,638 will be held valid and infringed.